UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:    3/5/2021
```

Daniel Delgado Torres,

                                    Plaintiff,

               -against-

Commissioner of Social Security,

                                    Defendant.

19-cv-08610 (SDA)

<u>OPINION AND ORDER</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Daniel Delgado Torres ("Torres" or "Plaintiff") brings this action pursuant to §

205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of

the Commissioner of Social Security, denying his application for disability insurance benefits

("DIB"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant

to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF

No. 29; Comm'r Not. of Mot., ECF No. 31.) For the reasons set forth below, the Commissioner's

motion is GRANTED and Plaintiff's motion is DENIED.

<u>BACKGROUND</u>

I.      <u>Procedural Background</u>

On December 16, 2015, Plaintiff filed an application for DIB, alleging a disability onset

date of December 31, 2014.[1] (Administrative R. ("R."), ECF Nos. 15 & 27, 15.) Plaintiff's

application was denied initially on February 5, 2016. (R. 15.) Thereafter, Plaintiff requested a

---

[1] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (E); 20 C.F.R. §§ 404.101, 404.120, 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Plaintiff's DLI is December 31, 2019. (R. 127.)

hearing, which was held on March 20, 2018, before Administrative Law Judge ("ALJ") Robert Gonzalez. (R. 600-23.) ALJ Gonzalez denied Plaintiff's claim in a decision dated September 7, 2018. (R. 25). Plaintiff appealed to the Appeals Council. ALJ Gonzalez's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on July 11, 2019. (R. 1-3.) This action followed.

## II. Non-Medical Evidence

Born on March 9, 1966, Plaintiff was 48 years old on the alleged onset date and 52 years old at the time of the 2018 hearing. (R. 85.) Plaintiff has a high school education from Puerto Rico and past relevant work as a painter and commercial cleaner. (R. 603, 618.) Plaintiff lives with his wife who does the household chores. (R. 615-16.) On March 28, 2014, Plaintiff was involved in a motor vehicle accident in which he was rear-ended while waiting at a stop light. (*See, e.g.*, R. 527, 575.)

## III. Relevant Medical Evidence

### A. Southern Westchester Family Medicine

Since at least June 2010, and throughout the relevant period, Plaintiff received primary medical care from Dr. Luay Marji, M.D. at Southern Westchester Family Medicine. (R. 514-89.) Dr. Marji was the referring physician for many of the consultations discussed further below. (*See, e.g.*, R. 530, 536.) In addition, Dr. Marji saw Plaintiff for a physical exam approximately every six

months, or more, between June 2010 and March 2018, with more frequent appointments following his car accident and wrist surgery in 2014. (R. 548-89.)

**B.      WESTMED Medical Group**

On May 8, 2014, Plaintiff saw Dr. Michael Cushner, M.D. at WESTMED Medical Group for an orthopedic evaluation. (R. 526-29.) Dr. Cushner noted diffuse swelling and weakness in Plaintiff's left wrist, mild paraspinal tenderness in his lower back and tenderness, though no reduced range of motion, in his neck. (R. 526-27.) Dr. Cushner recommended medication, physical therapy for Plaintiff's neck and back, a splint for his wrist and an MRI if the pain persisted. (R. 527-29.)

**C.      Executive Park Orthopedic & Sports Physical Therapy**

On April 17, 2014, Doctor of Physical Therapy ("DPT") Laura Anastasia diagnosed Plaintiff with C6/C7 disc bulge and lumbar strain following a motor vehicle accident on March 28, 2014. (R. 200-01.) Plaintiff had limitations in changing and maintaining body position, remaining seated, carrying, moving and handling objects, pulling and pushing objects, and picking up and grasping. (R. 201.) DPT Anastasia recommended continuing physical therapy 2-3 times per week for six weeks and a home exercise program. (R. 201-02.) Torres saw DPT Anastasia for ten physical therapy sessions between April 17, 2014, and May 9, 2014. (R. 200-21.)

Plaintiff returned to Executive Park on January 26, 2016. (R. 487-89.) Plaintiff complained of pain and difficulty with his left hand and back. (*Id.*) On exam, Plaintiff had supination of his left elbow at 60 degrees and full pronation with pain. (*Id.*) Plaintiff had limited range of motion of his wrist and lumbar spine. (R. 490.) Grip strength was 40 psi on the left side and 100 psi on the right. (*Id.*) Plaintiff's functional limitations included self-care; changing and maintaining body position;

mobility; and carrying, moving, and handling objects. (R. 489.) Plaintiff continued physical therapy several times per week through at least April 1, 2016. (R. 455-86.) Plaintiff continued to report difficulty gripping with his left hand with limited range of motion and some lower back pain. (*See id.*) His physical therapists continued to assess his rehabilitation potential as good. (R. 458, 462, 467, 470, 471, 473, 475, 477, 479, 481, 483, 485.)

###    D.    **Uptown Medical Imaging**

On April 18, 2014, Plaintiff underwent magnetic resonance imaging ("MRI") of the lumbar spine. (R. 257, 530.) The MRI showed spondylitic[2] changes at L3-4 and L4-5 and bulging at L4-5, but no stenosis was demonstrated. (*Id.*)

###    E.    **Bruckner Medical, P.C.**

Torres saw Dr. Erie Agustin, M.D. at Bruckner Medical, P.C. for an initial consultation on May 13, 2014. (R. 222-28.) Dr. Augustin's initial diagnostic impression was of cervical radiculitis, cervical spine strain, lower back pain syndrome, back pain unspecific, lumbar sprain, lumbar displacement/herniation without myelopathy, and left wrist derangement. (R. 225.) Dr. Agustin recommended physical therapy and referred Plaintiff for an MRI of his left wrist. (R. 226-27.) Dr. Agustin noted that Plaintiff would have limitations with bending/twisting, operating heavy machinery and lifting. (R. 228.) The same day, Plaintiff began physical therapy with a therapist at the Bruckner P.C., which continued approximately two or three times per week through January 2015. (R. 259-60.)

---

[2] Spondylitic is derived from the term spondylosis. "Spondylosis is a broad term that simply refers to some type of degeneration in the spine." *Laureano v. Comm'r of Soc. Sec.*, 17-CV-01347 (SDA), 2018 WL 4629125, at *4 (S.D.N.Y. Sept. 26, 2018).

The MRI of the left wrist ordered by Dr. Agustin, completed on May 21, 2014, showed a widening of the scapholunate space, tear of scapholunate ligament,[3] tear of the triangular fibrocartilage near the ulnar attachment, and moderate intercarpal joint effusion consistent with trauma or synovitis.[4] (R. 258.) Dr. Agustin saw Plaintiff for follow-up visits on July 3, 2014, September 2, 2014, October 12, 2014, and November 25, 2014. (R. 229-50.) On December 23, 2014, Dr. Augustin opined that Plaintiff had a good prognosis but had 80% temporary impairment and had limitations bending/twisting, operating heavy equipment, and lifting. (R. 256.)

F.     **New York Plastic Surgical Group/Manhattan Eye, Ear & Throat Hospital**

On June 12, 2014, Plaintiff saw Dr. Joseph Zuckerman for a consultation regarding his left wrist pain. (R. 329-32.) Dr. Zuckerman noted that Plaintiff likely would require surgery and ordered another MRI. (R. 329.)

An MRI of the left wrist on June 23, 2014, showed signs consistent with a tear of the scapholunate ligament. (R. 337-39.) Plaintiff underwent surgery for his wrist on July 24, 2014, specifically left wrist repair of the scapholunate dissociation. (R. 319-25.) Plaintiff's postoperative diagnosis was of left wrist chronic scapholunate ligament disassociation. (R. 319.)

Plaintiff saw Dr. Zuckerman for a post-op visit on July 31, 2014. (R. 317.) Dr. Zuckerman referred him to occupational therapy. (*Id.*) Plaintiff saw Dr. Zuckerman for additional follow-up

---

[3] "The scaphoid and lunate are two adjacent bones in the wrist. . . . The scapholunate ligament connects these two bones, and the area between them is the scapholunate interval." *Young v. United States*, 667 F. Supp. 2d 554, 556 (D. Md. 2009).

[4] "Synovitis is the '[i]nflammation of a synovial membrane, especially that of a joint; in general, when unqualified, the same as arthritis.'" *Moore v. Commissioner*, No. 13-CV-00168 (KPF) (GWG), 2014 WL 630589, at *2 n.5 (S.D.N.Y. Feb. 18, 2014) (quoting *Stedman's Medical Dictionary*, 1773, 1088, 937 (27th ed. 2000)).

visits on August 12, 2014, August 28, 2014, September 11, 2014 and October 2, 2014. (R. 313-16.)

On January 22, 2015, Dr. Zuckerman examined Plaintiff six months after Plaintiff's wrist surgery. (R. 311.) Plaintiff had returned to work and complained of limited wrist range of motion, lack of endurance with his left hand, "somewhat limiting his ability to carry heavy objects." (*Id.*) On examination, Dr. Zuckerman noted that Plaintiff's left wrist was stable and nontender, the range of motion of his digits was full, and grip strength was 86 pounds as compared to 120 pounds on the right side. (*Id.*)

### G.   Westchester Neurological Consultants

On November 12, 2015, Plaintiff saw Dr. Emad Soliman for a neurological consultation and evaluation based on a referral from Plaintiff's primary care physician, Dr. Marji. (R. 353-56, 536.) Plaintiff complained of pain and difficulty with range of motion at the left wrist, as well as of back pain radiating to both lower extremities. (R. 369-72.) Dr. Soliman observed reduced muscle strength in the upper left extremity. (R. 369.) There was no sign of motor or muscle atrophy. (R. 370-71.) Dr. Soliman diagnosed Plaintiff with questionable complex regional pain syndrome, mechanical trauma to the arm, and lumbar radiculopathy. (R. 372.) Dr. Soliman recommended that Plaintiff avoid heavy weightlifting and referred him for an MRI of the left wrist without contrast and nerve conduction testing. (*Id.*)

Dr. Soliman also completed a medical questionnaire on the same date. (R. 350.) Dr. Soliman opined that Plaintiff could at most sit for fifteen minutes at a time, stand for five minutes at a time, sit and stand/walk for less than two hours a day, and would need to shift positions at

will. (*Id.*) Dr. Soliman also opined that Plaintiff could never lift more than 10 pounds; could never

reach, feel, bend, handle, push/pull; and could occasionally climb, kneel, and squat. (*Id.*)

On December 14, 2015, Plaintiff received the MRI ordered by Dr. Soliman, which showed

abductor pollicis longus, extensor pollicis brevis, and flexor pollicis longus tendinopathy. (R. 374-

75.) On April 5, 2016, Plaintiff underwent an electrodiagnostic study of the bilateral upper

extremities, which showed evidence of mild chronic left C8 radiculopathy. (R. 376-80.) On July

16, 2016, an MRI of lumbosacral spine ordered by Dr. Soliman showed minimal degenerative disc

disease L3-L4, L4-L5 with straightening of the lumbar lordosis. (R. 381-82.)

### H.    Dr. Julia Kaci, M.D. – January 22, 2016 Consultative Examination

Dr. Julia Kaci performed a consultative examination of Plaintiff on January 22, 2016. (R.

364.) Plaintiff reported that he does not do any cooking, cleaning or laundry but does shower and

dress daily. (R. 364.) On examination, Dr. Kaci found that Plaintiff had a normal gait, could squat

two-thirds, did not use an assistive device while walking, needed no help changing for the exam,

getting on and off the exam table, and could rise from a chair without difficulty. (R. 365.) Dr. Kaci

observed 5/5 grip strength on the right hand and 4/5 on the left. (R. 365.) Strength in Plaintiff's

left wrist was 3/5 and strength on his left side was 4+/5 left proximally and 4/5 distally. (R. 365.)

There was no muscle atrophy. (R. 365.) Dr. Kaci opined that Plaintiff's left hand and finger

dexterity was mildly affected in ability to zip, button and tie. Plaintiff had a positive straight leg

raise test at 45% degrees on the left in the supine position and negative straight leg raise in the

sitting position. (R. 366.) Dr. Kaci diagnosed Plaintiff with lower back pain and left wrist pain with

history of ligament tear, status post-surgery. (*Id.*) She opined that Plaintiff has mild limitations to

squatting, sitting and standing; moderate limitations to activities requiring fine motor activity of the left hand; and mild limitations to lifting, carrying, pushing, and pulling. (*Id.*)

     **I.**     **Doctors United, Inc.**

Beginning on December 1, 2016, Plaintiff began receiving treatment and physical therapy and for his lower back, left wrist and knees at Doctor's United, Inc. (R. 453-54.)

On December 2, 2016, Plaintiff's physical therapist completed an evaluation for Plaintiff. (R. 409.) The therapist noted pain in Plaintiff's lower back, left wrist and both knees, as well as decreased range of motion and muscle strength in the cervical spine, upper extremities, left hand, and left wrist. (*Id.*) Plaintiff also underwent x-rays of both knees, which showed mild degenerative joint disease. (R. 412.) In addition, Plaintiff underwent a nerve conduction study, which Dr. Sujata Vidyasaga stated revealed no abnormalities. (R. 413-16, 425-28.) Dr. Mark Peralta saw Plaintiff for a follow-up on December 23, 2016. (R. 448.) Dr. Peralta gave Plaintiff a B12 injection at each visit and recommended he continue to attend physical therapy. (*Id.*) On December 30, 2016, Dr. Peralta saw Plaintiff again to review lab results and for another B12 injection. (R. 446.)

On January 3, 2017, a physical therapy initial evaluation found muscle spasm, tightness, and tenderness of the lumbosacral paraspinal region. (R. 405.) There was positive limitation of motion and positive muscle weakness. (*Id.*) Straight leg raise test was positive on both sides. (*Id.*) The physical therapist noted that Plaintiff had difficulty with prolonged sitting and lifting objects. (*Id.*) The therapist further observed that Plaintiff had decreased range of motion and muscle strength of his lumbar spine. (*Id.*) On January 30, 2017, and again on February 16, 2017, Dr. Vidyasagar completed what appears to be a portion of a form stating that Plaintiff never could

return to work. (R. 435-36.) Plaintiff continued to receive physical therapy at Doctors United approximately three times per week. (R. 400-04, 406-08.)

Dr. Nabaveni Rao, M.D. examined Plaintiff on March 15, 2017. (R. 452.) Dr. Rao observed that Plaintiff had limited range of motion and tenderness of the lumbar spine. (*Id.*) Plaintiff's strength was 5/5, and straight leg raise test was negative. (*Id.*) Dr. Rao noted that Plaintiff's left wrist range of motion was markedly limited and that Plaintiff had difficulty standing up. (*Id.*) Dr. Rao also completed a multiple impairment questionnaire on the same date. (R. 391-98.) Dr. Rao diagnosed Plaintiff with lumbar degenerative disc disease with bilateral radicular systems, disc bulge, left wrist s/p surgery and bilateral knee arthritis. (R. 391.) Dr. Rao opined that Plaintiff could sit for up to 5-10 minutes and stand/walk for 20 minutes. (R. 393.) Dr. Rao also opined that Plaintiff could never lift or carry up to five pounds and that Plaintiff's left hand was useless. (R. 393-95.)

On July 10, 2017, a physician assistant ("PA") examined Plaintiff and noted tenderness present over the paraspinal muscle of the lumbar spine with normal range of motion and bilateral knee tenderness with decreased range of motion. (R. 450.) The PA also noted chronic low back pain and bilateral knee disorder. (*Id.*) Plaintiff continued to receive physical therapy at Doctor's United through at least September 2017. (R. 400-04.)

IV.    **The March 18, 2018 Administrative Hearing**

Plaintiff appeared with counsel for an administrative hearing before the ALJ on March 18, 2018. (R. 600-23.) Plaintiff testified with the assistance of a Spanish-language interpreter, but Plaintiff answered some of the questions without need of the interpreter's assistance. (R. 23-24, 602, 611.) He described taking medication, including Gabapentin, Naprosyn and Diflax, as

needed, and stated that he periodically received injections from his primary care doctor to relieve his pain. (R. 610-11.) Plaintiff testified that he had only ten percent of function in his left hand. (R. 612-13.) Plaintiff also described pain in his back that radiated down his legs. (*Id.*) Plaintiff testified that he had issues going up stairs, lifting, standing or sitting for long periods, and walking. (R. 614-15.)

Vocational expert ("VE") Komorov also testified at the hearing. (R. 616-21.) The VE testified that a hypothetical person with Plaintiff's age, education and work history with the Residual Functional Capacity ("RFC") to engage in a full range of light work with the additional limitation that the person can only frequently handle and finger bilaterally; occasionally stoop, crouch, push or pull and cannot operate a motor vehicle, could not perform Plaintiff's past work as a painter (Dictionary of Occupational Titles ("DOT") code 840.381-010) or commercial cleaner (DOT code 381.687-014). (R. 618.) The VE testified that there were other jobs in the national economy that such a hypothetical person could perform, including photocopy machine operator (DOT code 207.685-014), mail clerk (DOT code 209.687-026), nuts and bolts assembler (DOT code 929.587-010) and marker (DOT code 209.587-034). In response to questions from Plaintiff's attorney, the VE testified that if the hypothetical person was further limited to sitting, standing and walking for a total of four hours he could not perform competitive work and if the individual was off task up to twenty percent of the time or could not lift or carry more than five pounds, the jobs identified by the VE would not be available. (R. 620-21.)

Following the hearing, the ALJ attempted to seek clarification from Dr. Rao and Dr. Soliman regarding their medical opinions but received no response. (R. 189-92, 591-94, 596-99.)

V.      **ALJ Gonzalez's Decision And Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards

Section II, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity

since December 31, 2014, the alleged onset date. (R. 17.) At step two, the ALJ determined that

the following impairments were severe: "degenerative disc disease of the lumbar spine with

radiculopathy; carpal tunnel syndrome; status post bilateral wrists surgery; and bilateral

osteoarthritis of the knee." (R. 18-19.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 (the "Listings"). (R. 19-20.) The ALJ specifically considered Listings 1.02

(Major dysfunction of a joint) and 1.04 (Disorders of the spine). The ALJ ruled out both because

the record did not demonstrate the medical findings necessary to meet the Listings criteria. (*See

id.*)

The ALJ then assessed Plaintiff's RFC and determined that he was able "to perform light

work as defined in 20 C.F.R. 404.1567(b) except he can frequently handle and finger bilaterally;

can occasionally push and pull; stoop and crouch, and can never operate a motor vehicle."[5] (R.

18.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work and

proceeded to step five. (R. 24.) At step five, the ALJ considered Plaintiff's age, education and job

skills, along with his RFC determination, and, based on testimony from the VE, concluded that

---

[5] "Frequently" and "occasionally" are terms of art under Social Security regulations. *See Rivera v. Comm'r of Soc. Sec*., 394 F. Supp. 3d 486, 496 (S.D.N.Y. 2019) (citing *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)). Frequently means "from one-third to two-thirds of the time." Social Security Regulation ("SSR") 83-14. Occasionally means "very little up to one-third of the time." *Id.*

there were other jobs existing in significant numbers in the national economy that Plaintiff could perform, including photocopy machine operator, mail clerk, and nut and bolt assembler. (R. 24.) Therefore, the ALJ found Plaintiff was not disabled during the relevant period and denied his claim for benefits. (*Id.*) Following the ALJ's decision, Plaintiff sought review from the Appeals Council, which denied his request on July 11, 2019. (R. 1-6.)

## LEGAL STANDARDS

### I.   Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union*, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Ulloa*, 2015 WL 110079, at *6 (quoting *Ellington v. Astrue*, 641 F.Supp.2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

Absent legal error, the ALJ's disability determination only may be set aside if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating

and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The substantial evidence standard is 'a very deferential standard of review—even more so than the clearly erroneous standard,' and the Commissioner's findings of fact must be upheld unless 'a reasonable factfinder *would have to conclude otherwise*.'" *Banyai v. Berryhill*, No. 17- CV-01366, 2019 WL 1782629, at *1 (2d Cir. Apr. 24, 2019) (summary order) (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original) (internal quotation marks omitted). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995); *accord Nadia T. Tranter v. Astrue*, 743 F. Supp. 2d 292, 301 (S.D.N.Y. 2010).

## II.   <u>Determination Of Disability</u>

A person is considered disabled for benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 ["Listings"] . . . and meets the duration requirement, we will find that you are disabled. . . .
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. . . .

20 C.F.R. § 404.1520(a)(4).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record[.]" 20 C.F.R. § 404.1520(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 405.1545(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999). It is only after the claimant proves that he cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* In conducting a disability analysis, the ALJ has an affirmative duty to "develop the record." *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (summary order) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

### III.     The Treating Physician Rule[6]

An ALJ must follow specific procedures "in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). First, the ALJ must decide whether a treating physician's opinion is entitled to "controlling weight." *Id.* The ALJ must give controlling weight to the opinion of a claimant's treating physician as to the nature and severity of the impairment as long as it "'is well-supported by medically acceptable clinical and

---

[6] On January 18, 2017, the SSA promulgated a final rule that dramatically changes the nature of the evaluation of medical opinion evidence. *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 2017 WL 168819 (Jan. 18, 2017) (codified at 20 C.F.R. §§ 404 & 416). These new regulations apply only to claims filed with the SSA on or after March 27, 2017. Accordingly, because Plaintiff's claims were filed before that date, to the extent that the regulations regarding medical opinion evidence are cited in this Opinion and Order, the Court is referring to the version of the regulations effective before March 27, 2017.

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, [including] the opinions of other medical experts.").

If the ALJ decides the treating physician's opinion is not entitled to controlling weight, the ALJ "must determine how much weight, if any, to give it." *Estrella*, 925 F.3d at 95. "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir. 1988)). In deciding what weight to assign, the ALJ must "explicitly consider" the following, nonexclusive factors (the "*Burgess* factors"): "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (citing *Burgess*, 537 F.3d at 129) (additional citations omitted).

At both steps, the ALJ must give "good reasons" for the weight he gives a treating source's medical opinion. *See Halloran*, 362 F.3d at 32 (2d Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("The ALJ was required either to give [the treating physician's] opinions controlling weight or to provide good reasons for discounting

them."). "[A]n ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20 (2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the substance of the treating physician rule was not traversed," the Court should affirm. *Id.* (citing *Halloran*, 362 F.3d at 32).

## DISCUSSION

Plaintiff argues that remand is required because: (1) the ALJ violated the treating physician rule; (2) the ALJ failed to properly consider the severity of Plaintiff's knee impairments; (3) the ALJ failed to conduct a proper credibility analysis; and (4) the ALJ failed to analyze whether Plaintiff could communicate in English. (Pl.'s Mem., ECF No. 25, at 16-25.) The Court addresses each of these arguments in turn.

## I. The ALJ's Weighing Of The Medical Opinion Evidence

Plaintiff argues that the ALJ failed to follow the treating physician rule by giving little weight to Dr. Soliman's November 2015 opinion and Dr. Rao's March 2017 opinion, and instead giving greater weight to the opinion of Dr. Kaci, the consultative examiner. (Pl.'s Mem. at 16-18.)

The ALJ declined to give controlling weight to the opinions of Dr. Soliman and Dr. Rao because he found no evidence that either physician had a longitudinal treating relationship with Plaintiff. (R. 22-23.) The opinion by Dr. Soliman was given during his initial consultation with Plaintiff, and the opinion of Dr. Rao was given after he had been receiving treatment at Doctors United for approximately four months, though it appears to have been Dr. Rao's only assessment of Plaintiff. Notably, the ALJ attempted to clarify these opinions, but received no response. (R. 189-92.) Accordingly, the ALJ did not err in finding that these opinions were not entitled to

17

controlling weight. *See Reilly v. Colvin*, No. 13-CV-00785 (MAT), 2015 WL 6674955, at *2 (W.D.N.Y. Nov. 2, 2015) (treating physician rule "requires that a physician have a longitudinal treatment relationship with a claimant: '[a] doctor who examines a claimant once or twice is not a treating physician.'") (quoting *Mongeur,* 722 F.2d at 1039 n.2).

In any event, an ALJ is not required to give a treating physician's opinion controlling weight if it is inconsistent with other substantial evidence in the record. Here, the ALJ found that the opinions limiting Plaintiff to less than sedentary work were inconsistent with other evidence in the record showing normal muscle strength in the lower extremities and right upper extremity and normal gait. (R. 22-23.) The ALJ also found that portions of Dr. Soliman's opinion were internally inconsistent, though he gave some weight to Dr. Soliman's opinion that restricted Plaintiff from heavy lifting, which he found consistent with other evidence regarding weakness in Plaintiff's left wrist. (R. 23.) In addition, the ALJ permissibly gave greater weight to the opinion of the consultative examiner, Dr. Kaci, which he found to be more consistent with the overall record. *See Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018).

At the second step, while the ALJ did not explicitly discuss each of the *Burgess* factors, even assuming Dr. Rao and Dr. Soliman are treating sources, the Court finds that a searching review of the record indicates that the substance of the rule was not traversed. *See Estrella*, 925 F.3d at 96 (citing *Halloran*, 362 F.3d at 32). The ALJ discussed the frequency and length of Plaintiff's treatment with both physicians and noted that Dr. Soliman saw Plaintiff for a "neurology visit." (R. 20, 22-23.) In addition, as set forth above, the ALJ discussed the specific findings of these physicians as compared to other providers and cited to evidence in the record that he found inconsistent with the more restrictive opinions of Dr. Rao and Dr. Soliman. (R. 20-

18

23.) Though a different fact finder may have weighed the evidence differently, the Court finds that Plaintiff has not identified any error warranting remand.

**II.    The ALJ's Severity Determination**

Next, Plaintiff argues that the ALJ erred at step two in determining that Plaintiff's degenerative joint disease of the knee was not severe. (Pl.'s Mem. at 18-21.) Plaintiff further argues that the ALJ failed to analyze how this impairment even if non-severe, impacted Plaintiff's RFC. (R. 20-21.) The Court finds that any error at step two was harmless because, despite finding that degenerative joint disease of the knee was not a medically determinable impairment, the ALJ included bilateral osteoarthritis of the knee, an identical or at least very similar impairment, as a severe impairment. (R. 17.) "Osteoarthritis is 'a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.'" *Cohen-Aikens v. Saul*, No. 19-CV-04443 (SDA), 2020 WL 3126172, at *1 n.6 (S.D.N.Y. June 13, 2020) (citing *Dorland's Illustrated Medical Dictionary* 1344 (32d ed. 2012); *see also Gaudette v. Colvin*, No. 14-CV-00070, 2015 WL 6000258, at *7 n.3 (D. Vt. Oct. 14, 2015) ("Osteoarthritis is a synonym for degenerative arthritis or degenerative joint disease.") (internal quotation marks omitted).

Moreover, the record shows that the ALJ discussed the medical evidence regarding Plaintiff's knees in making his RFC determination. *See Dixon v. Berryhill*, No. 17-CV-00334 (AJP), 2017 WL 3172849, at *12 n.29 (S.D.N.Y. July 26, 2017) ("failure to list an impairment as 'severe' is a harmless error if the ALJ ultimately considered the impairment within the RFC determination.") (collecting cases). Thus, there is no merit to Plaintiff's argument that the ALJ failed to properly consider the severity of his knee impairment.

**III.**   **The ALJ's Credibility Determination**

Third, Plaintiff argues that the ALJ failed to conduct a proper credibility analysis.[7] (Pl.'s

Mem. at 21-23.) "To satisfy the substantial evidence rule, the ALJ's credibility assessment must

be based on a two-step analysis of pertinent evidence in the record." *Bennett v. Comm'r of Soc.*

*Sec.*, No. 15-CV-00140 (MAD) (ATB), 2016 WL 11477512, at *11 (N.D.N.Y. Feb. 18, 2016), *report*

*and recommendation adopted sub nom. Bennett v. Colvin*, 2016 WL 916420 (N.D.N.Y. Mar. 10,

2016); *see also* 20 C.F.R. § 404.1529. First, the ALJ must determine whether the claimant, in fact,

suffers from an underlying medical condition or impairment, and second, the ALJ must determine

whether such a condition or impairment could reasonably be expected to cause the symptoms

claimed. *Id.* An ALJ "is not required to accept the claimant's subjective complaints without

question; he may exercise discretion in weighing the credibility of the claimant's testimony in

light of the other evidence in the record." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750,

762-63 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Barry v. Colvin*, 606 F. App'x

621, 622 (2d Cir. 2015)).

"Although not unbounded, an ALJ has considerable discretion in weighing the credibility

of a claimant's testimony." *Robles v. Colvin*, No. 16-CV-01557 (KMK) (LMS), 2019 WL 7790854, at

*16 (S.D.N.Y. Apr. 9, 2019), *report and recommendation adopted*, 2020 WL 882132 (S.D.N.Y. Feb.

24, 2020) (citing *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("It

is the function of the Secretary, not ourselves, to resolve evidentiary conflicts and to appraise the

---

[7] The Court notes that Plaintiff refers to SSR 96-7, which was superseded by SSR 16-3p as of March 28, 2016. This later SSR eliminated the use of the term "credibility" and clarified that, in examining a claimant's symptoms, an ALJ is not evaluating the claimant's character. *See* S.S.R. 16-3P, 2016 WL 1119029, at *1.

credibility of witnesses, including the claimant.")). When assessing the existence and severity of symptoms arising from the claimant's underlying medical condition or impairment, applicable regulations state that an ALJ should consider various factors, including: the claimant's daily activities; intensity and persistence of pain and other symptoms; the factors that aggravate the claimant's symptoms; and the treatments and medications used to alleviate the pain. *See* 20 C.F.R. § 404.1529. However, the ALJ does not need to discuss all the factors so long as the ALJ's determination "includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasoning for that weight." *Simmons v. Comm'r of Soc. Sec.*, 103 F. Supp. 3d 547, 569 (S.D.N.Y. 2015) (quoting *Felix v. Astrue*, No. 11-CV-03697 (KAM), 2012 WL 3043203, at *8 (E.D.N.Y. July 24, 2012)).

Plaintiff argues that the ALJ erroneously relied on a perceived inconsistency with the consultative examiner's opinion and the medical evidence as a whole in discounting his subjective allegations. (Pl.'s Mem. at 22.) The Court finds Plaintiff's argument unavailing. The ALJ compared Plaintiff's subjective complaints with his treatment history, the evidence in the record, and Plaintiff's testimony to conclude that the symptoms arising from his impairments were less severe than alleged. The ALJ noted that the lack of muscle atrophy was inconsistent with Plaintiff's claim to be essentially chair-ridden and contrasted Plaintiff's testimony with the lack of evidence showing continued and significant sensory deficit and motor disruption. (R. 21-22.) Thus, the Court finds that the ALJ's credibility determination is supported by substantial evidence.

IV.   **The ALJ's Language Determination**

Finally, Plaintiff argues that the ALJ made an erroneous determination that Plaintiff could communicate in English[8] and, as a result, did not ask the VE to consider any limitations regarding Plaintiff's language ability. (Pl.'s Mem. at 23-25.) In a footnote, the Commissioner contends, without discussion, that "[t]here is no merit to Plaintiff's argument that the ALJ did not adequately consider whether [Plaintiff] understood English." (Def.'s Mem., ECF No. 32, at 11-12 n.4.) In explaining his determination that Plaintiff could communicate in English, the ALJ relied on the disability report and Plaintiff's testimony to conclude that Plaintiff could understand simple instructions and perform simple, unskilled work.[9] (R. 23-24.)

While the record is somewhat mixed regarding Plaintiff's language capabilities, the Court finds that the ALJ's determination is supported by substantial evidence. In his initial disability report, Plaintiff indicated that he could read and understand English and that he could write more than his name in English, but that he could not speak or understand English.[10] (R. 129.) During the hearing, Plaintiff used a Spanish-language interpreter, but answered multiple questions

---

[8] Though "inability to communicate in English" remains the correct standard for this case, the SSA has updated the rules to remove this language for cases filed on or after April 27, 2020. *See Estrada v. Comm'r of Soc. Sec.*, No. 18-CV-03530 (KAM), 2020 WL 3430680, at *7 n.1 (E.D.N.Y. June 23, 2020) (citing Removing Inability To Communicate in English as an Education Category, 85 Fed. Reg. 10586-01).

[9] The Medical-Vocational Rules state: "While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance." 20 C.F.R. § 404, Subpart P, App. 2, ¶ 202.00(g).

[10] Under the applicable regulations, literacy and communication are treated separately. *See* 20 C.F.R. §§ 416.964(b)(1), (b)(5); *see also Negron v. Saul,* No. 19-CV-07547 (KMK) (JCM), 2021 WL 465768, at *26 (S.D.N.Y. Feb. 8, 2021) ("Whereas illiteracy is defined as the inability to read or write, the inability to communicate in English is a separate educational factor that the SSA may consider.") (internal citation and quotation marks omitted).

without the assistance of an interpreter. (R. 23, 611.) For example, when asked by the ALJ, "[w]hen is the last time you received an injection?", Plaintiff responded in English "four months." (R. 610.) Thus, the ALJ noted on the record that Plaintiff was answering questions before they were translated. (R. 611 (ALJ stating during hearing "you are answering these questions before the translator is translating them").) In addition, while certain medical records indicate that Plaintiff required translation or was Spanish-speaking (*see* R. 200, 353; *see also* R. 441-42, 444 (utilizing Spanish language forms)), the majority of Plaintiff's medical appointments, including the consultative examination, do not reference the use of an interpreter and appear to have been conducted in English. (*See*, *e.g.*, R. 364-66.) Accordingly, I find no merit to Plaintiff's argument that the ALJ erred by not asking the VE to consider any limitations based on Plaintiff's alleged inability to communicate in English.[11]

The Court acknowledges, however, that although the ALJ determined that Plaintiff could communicate in English for purposes of simple, unskilled work, the ALJ did not ask the VE to limit

---

[11] The Court recognizes that some courts have found the fact that a plaintiff answered questions in English insufficient to support a finding that a plaintiff could communicate in English. *See, e.g.*, *Cabrera v. Astrue*, No. 06-CV-09918, 2007 WL 2706276, at *6 (S.D.N.Y. Sept. 18, 2007) (claimant's testimony that she sometimes read newspaper and watched television in English, but could not always understand the words, insufficient to support conclusion that she could communicate in English), *modified on other grounds*, 2008 WL 144697 (S.D.N.Y. 2008); *see also Delacruz v. Astrue*, No. 10-CV-05749 (JGK) (MHD), 2011 WL 6425109, at *25 (S.D.N.Y. Dec. 1, 2011), *report and recommendation adopted*, 2011 WL 6425101 (S.D.N.Y. Dec. 21, 2011). Here, however, Plaintiff answered specific questions about his medical history in English and the ALJ explained the basis for his finding in his written decision. *Cf. Vega v. Harris*, 636 F.2d 900, 904 (2d Cir. 1981) (brief exchange in English during hearing was not substitute for determination as to plaintiff's ability to communicate in English). Moreover, the ALJ limited Plaintiff to simple, unskilled work and utilized the testimony of a vocational expert, as opposed to relying solely on the Medical-Vocational Guidelines (the "Grids"). As discussed further herein, the Court finds that substantial evidence supports the Commissioner's determination at step five that there were other jobs in the national economy that Plaintiff could perform.

Plaintiff to simple, unskilled work or to consider any limitations in Plaintiff's ability to communicate. Instead, the ALJ asked the VE to assume a hypothetical person with Plaintiff's age, education and work history. (R.  618.) "While an ALJ may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person with the claimant's capabilities, the facts of the hypothetical must be based on substantial evidence and accurately reflect the limitations and capabilities of the claimant." *Roman v. Berryhill*, No. 17-CV-02804 (VSB) (DCF), 2018 WL 7291422, at *9 (S.D.N.Y. May 9, 2018), *report and recommendation adopted*, 2019 WL 588464 (S.D.N.Y. Feb. 13, 2019)  (citing *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citations omitted)).

Under the circumstances here, the Court finds that the ALJ's failure to include a language limitation in the hypothetical to the VE was harmless error. *See*, *e.g.*, *Ruiz v. Saul*, No. 18-CV-6404L, 2020 WL 57197, at *2 (W.D.N.Y. Jan. 3, 2020) (failure to include limited education in hypothetical to VE did not undermine ALJ's ultimate finding as to disability when VE heard testimony regarding plaintiff's education and was asked to assume hypothetical individual with same education). The jobs identified by the VE in response to the ALJ's hypothetical were unskilled and all but one required Level 1 language skills, the most basic of the levels used in the DOT.[12] (R. 618-19.) In terms of ability to speak, Level 1 requires only the ability to "[s]peak simple sentences, using normal word order, and present and past tenses." *Negron*, 2021 WL 465768, at

---

[12] "Each job description in the [DOT] includes General Educational Development ('GED') levels rated between '1' and '6' pertaining to reasoning, mathematical and language development." *Negron*, 2021 WL 465768, at *27 n.24 (citing Appendix C–Components of the Definitional Trailer, Dictionary of Occupational Titles, 1991 WL 688702 (4th ed. 1991)). "The GED levels describe the general educational background that makes an individual suitable for a particular job." *Id.*

*27 n.25. Notably, Plaintiff's prior work as a painter required an even higher level of language skills according to the DOT. *See* Dictionary of Occupational Titles Code 840.381-010 (4th ed. 1991), *available at* https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (indicating Level 2 language skills for painter). Accordingly, despite the ALJ's failure to explicitly include a limitation on Plaintiff's ability to communicate in English, I find that the ALJ's determination that there were significant numbers of jobs in the national economy that Plaintiff could perform is supported by substantial evidence. *Cf. Negron*, 2021 WL 465768, at *28 ("The Court recognizes that Plaintiff's English may be rudimentary, but on this record, finds that there is enough evidence to support that Plaintiff had Level 1 language skills, the most basic of the GED levels.").

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is GRANTED and Plaintiff's motion is DENIED.

Dated:     March 5, 2021
           New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**